Thank you, Judge. May it please the Court, Aubrey Fletcher for Petitioner. In this case, the agency found Petitioner credible and his testimony must therefore be taken as true. As a threshold matter, we believe this Court should reverse the asylum filing deadline determination because it was based in part on nonexistent case law and in part because it was unsupported by substantial evidence. We hear that I.J. essentially found that Mr. Menjivar-Melgar v. Petitioner, and said that he failed to explore other options even though it's undisputed that a couple of months after he came to the United States, he consulted with one immigration practitioner. Can I have you step back and address a jurisdictional question, because the IAC and effective assistance of counsel as a basis for meeting extraordinary circumstances is a mixed question of law and we looked at whether the facts were undisputed. How does the matter of Lozada apply in this case, if at all? Well, it wasn't raised. The agency didn't rely on it in its one-year assessment, and the government hasn't argued it before the Board or here. And I think that the policy concerns involved in Lozada are satisfied because, in part, the Petitioner was found to be credible, so he's not colluding with anyone, he's not falsely claiming that he was misadvised. So I think the policy concerns are satisfied and it's not an issue that's in play. I think it is odd because the agency seems to have treated it as an IAC claim without exactly saying those words and without invoking Lozada. And because neither side invoked the matter of Lozada, it's undisputed that there's been a failure to comply with those factors, and so therefore it's not disputed. For purposes of determining jurisdiction, is that your argument? That is. Yes, that's our position. So the way the IJ analyzed it was that he basically wasn't duly diligent, but he, if you will, was a dedicated man, and that's borne out in the record. And he consulted with someone when he got here, was told he didn't qualify for TPS. He wasn't told anything about other forms of relief, specifically asylum. And he went and got a second opinion. He relied on the consultations that he had. You know, it's hard for me to figure out the extent of that consultation. It could almost be, you know, he saw somebody for two minutes and it's like a casual remark. He didn't actually become a client, right? There's no evidence of establishing an internal client relationship. Well, to the extent he became a client by seeking advice and receiving it. Well, it's like I walk up to a doctor at a cocktail party and say, you know, I have this ache in my armpit, and what should I do? He says, well, don't worry about it. Take an estate to the doctor for malpractice? Well, I certainly don't know the answer to that question, Your Honor. But I wouldn't want the doctor to go talking about what I had said in court. But I think he consulted to one of, we know that one of the agencies. What did he actually do? He went to find out if he was eligible for status in the United States. Did he go to somebody's office? No. He went to the agency Caressin, Central American. Before that he called an individual lawyer, didn't he? Right, and it is unclear from the record who that was. You can't tell exactly. That's right. I agree. Even whether you could classify it as a consultation. Talk to a lawyer. He spoke to a lawyer. He spoke to someone who he regarded as a lawyer and an expert in immigration, and then he went to a non-profit agency that provides those services. Right, so he went to the social services agency. That's right. A legal services agency, Caressin. What happened there? They said you're not eligible for TPS. He went to a receptionist and said, okay, we have a lawyer. We'll send you to a lawyer. Do you know what happened? I don't. It's unclear from the record. He went to an agency. He could have talked to a receptionist for all we know, right? Well, hopefully that's not what happened. Hopefully it's not, but we don't know. That's right. I understand Your Honor's point, but that wasn't really what was litigated here. And basically it was his due diligence after that that the court, the IJ, faulted him for not exercising, when really the record compels a different result. When he did speak with the lawyer later, he promptly filed for asylum afterwards. So we believe it should be remanded for asylum. My understanding from what I read from the government side is that he was arrested, and at that point he applies for asylum. That's right, because then he had occasion to consult with another lawyer. Right. But he didn't consult with a lawyer finally after four years and say, I guess I'm eligible. No, he got arrested, and the removal proceedings were begun, or at least threatened. He knows they're coming, and at that point he applies for asylum. That's the sequence? That is the sequence. And I think given his circumstances, his background, he wasn't being strategic, as the government has argued. He got a second opinion, which is pretty diligent, and he then relied on that until he had occasion to talk to a lawyer again. But as to the withholding claim, so the nexus finding, first of all, the board failed to follow this court's precedent recognizing family as a viable social group, and that has to be reversed. It's clear that family is a cognizable social group under the law. His other proposed social group is deportees to El Salvador, and we wrote to the court that we think remand is appropriate for consideration under Enriquez-Rivas, because the board here relied on the particularity and visibility criteria. But setting aside the social group issue, the BIA did discuss, you know, fairly extensively why the evidence in this case did not rise to the level of persecution. And so I'd like you to spend a couple of minutes addressing that and assuming we agree with the BIA that there's no past persecution, what does that do to your argument that the BIA failed to sufficiently evaluate the time bar issue? Well, the time bar issue, that just goes to asylum. So everything is still in play as to withholding, even if this court disagrees with our position on the time bar. But past persecution, so the board didn't consider all the harm cumulatively. It said he has not described an incident which rises to the level of persecution. Also, the board failed to follow this court's precedent, particularly in Hernandez-Ortiz, where it recognized that harm to infants and young children can rise to the level of persecution, where the same harm inflicted on an adult might not. And that case stated that where the applicant was a child during the events in question, harm to the family must be considered, and that's nowhere in the analysis by the agency. Well, you know, but if I recall correctly, that's the case where we have the young girl and we get the physical harm to her parents. He was, I think, two years old when they moved out, isn't that right? That's right. So I have trouble seeing that that case applies very clearly. Well, it may not lead to the same outcome, but it's analysis the agency was supposed to undertake. And he testified here that although he was small, he said, I suffered throughout the whole time of the war. He said my father would always remind us the problem was still alive and well. I feared the guerrillas all my life. He had to take to the fields at age seven. It very much affected his life, and none of that really got considered, and it should have been. And his fears of the risk to his family and himself were confirmed when he returned to his family. We're trying to take advantage of the presumption that arises from past persecution. Just review the bedding for me in terms of, okay, what is the evidence of past persecution to his family? I'm trying to treat your argument in the most sympathetic light. So, okay, review for me all the bad things that happened to the family members that you're trying to impute to him. To the family, there were very live and repeated threats to the point that they had to move around at night. They couldn't stay in their own home. They moved around among friends and relatives in the village and then ultimately had to leave their home village for decades, giving up everything they had and building a new life and living in hiding. That's the bulk of what happened, more repeated threats after he returned to his village. I want to talk about how the expert... And how long ago did that cease? Well, they're still living in hiding, unable to return to where they were from. The last threats... Living in a different place is different from living in hiding. Do we have evidence that they're actually living in hiding? Yes, they told everyone that they are in Honduras, and so they're having to live as the expert but in a marginal existence. Okay. As to the expert's testimony here, the IJ faulted him basically just for not having statistical evidence, when none is available, none is required, and the methods that were used are exactly the methods that are used in human rights reporting that's relied on by immigration judges all the time. Even the Department of State human rights reports rely on anecdotal evidence, and here he cited to Jose Miguel Cruz. I see I'm almost out of time, but I want to point out that elsewhere in the record, USAID, the Harvard Immigration Clinic, and the Financial Times all cite to the same person that this expert witness cited to, and that other instances in the country conditions documents confirm what the expert testified to, and basically we think that the one-year rule should be that finding should be reversed, the family's nexus should be reversed, and the rest of it should be remanded. Thank you. Let's hear from the government, and we will give you a chance to respond. Good morning, Your Honors, and may it please the Court, Michael Heiss on behalf of the Respondent, the Attorney General of the United States. The Court should deny this petition for review for three reasons. First, substantial evidence supports the agency's conclusion that Petitioner failed to qualify for withholding or cap protection because he did not suffer past prosecution. His particular social groups fail, and also his fear of future harm is objectively unreasonable. And I should also add a fourth reason that the Court initially was discussing, the timeliness of the asylum application question. Can I, before I forget to ask, have you addressed the Lozada, or the absence of the government's reliance or argument based on Lozada in trying to sort out this jurisdictional issue? I understand, Your Honor. And as Petitioner's counsel conceded here, this issue wasn't litigated. A review of Petitioner's brief to the Board shows that this somewhat hybrid, ineffective assistance of counsel claim simply isn't there. If the Court looks at Administrative Record, page 25 to 27, it mentions this consultation, and possibly, you know, considering different options. But there's nothing about this lawyer is ineffective, I suffered prejudice, citing things like Strickland. And what does that do to the Court's jurisdiction? Well, it's required under 8 U.S.C. 1252 D.1, as well as this Court's extensive case, Long Matters Barron is the most often cited case, 358 F. 3rd, 674. Issues not exhausted before the agency are not properly before this Court. But the government's never raised that, right? You never raised it before the BIA that there's a problem here because he had to comply with it. So it's important to raise arguments as to why there's an exceptional circumstance that should excuse the untimeliness of an asylum application. So it's not the government's burden necessarily to offer an ineffective assistance counsel claim or the failure to establish one that kind of flips the burden on the government there. Just give me your brief statement of what the unexhausted issue is that you're saying he can't raise now. He's alleging that he received ineffective assistance of counsel. That materially affected his decision not to seek asylum on a timely basis. And this goes to the one-year bar? Yes. All right. Now. Exclusively to that. So you say, what, he didn't raise that at all before the board? That's correct, Your Honor. Didn't raise it before the board. Didn't raise it explicitly as an ineffective assistance of counsel claim. It's mentioned as a reason that he didn't seek asylum right away, but his testimony belies any suggestion that it was counsel's decision that affected his choice. He may have received advice that he wouldn't qualify for asylum, and based on the testimony and decision in this case, that actually might be accurate advice. But he believed his claim would fail. It's Administrative Record 161. He looked at his own situation. He says he didn't seek asylum because he didn't believe he'd prevail. All right. Now, that's not a lawyer's fault. That's his own fault. It's anyone that he talked to might have looked at his case and said, you may have a shot, but it's not worth going after. That's a strategic decision that he consciously made. So was he represented at this point? When he made the decision to whether or not to seek asylum? Oh, before the board. Before the board, yes. Yes, there's a brief filed by counsel. He was represented before the agency by counsel. So that lawyer, like, made no attempt to comply with Rosado or even recognize that Rosado applied? Didn't even raise the ineffective assistance counsel argument. So, I mean, yes, those would be part and parcel, I would assume. But turning to the remaining issues before the court, the question of whether or not we have a valid particular social group here, he's proffered two groups now, actually. I think possibly a third or at least a reformation of the second group regarding individuals being returned to their home country. I believe it was originally cast as people targeted by gangs because they are deemed wealthy. I didn't hear that offered here, so I'm not sure which group we're talking about. But the ultimate point is that the fear of future harm is unreasonable. And also, looking backwards, the past persecution, as alleged, simply is not enough to rise to the level of past persecution. There's a question as to whether or not the board cumulatively considered all of the past persecution evidence. The immigration judge explicitly considered all the claims cumulatively. That's an administrative record 68 to 69. And the board's analysis here, inciting to the applicable case law, logically makes sense that those incidents which involve the board considered the composition of the social group. Did the board consider the social group? Yes, Your Honor. But that was before the Enriquez case, right? Yes. And what was the basis of the board decision? Lack of visibility or what? Not sufficiently particular, not socially visible, but also ultimately a lack of a nexus between membership in that group and the harm fear. Which is a different ground. You mean? Yes, that's the same. There's no group. Right. There's no group. Even if there were a group, there's no nexus. Correct, Your Honor. And specifically, the court was discussing the family's presence in El Salvador for nearly three decades without issue. They claimed to be living in hiding based on the evidence. It's actually Fischer's own testimony. This is administrative record, page 149. And, quote, there are no clear specific, and I'm paraphrasing, threats against his family. So the fact that they're paranoid and continue to live in hiding, that's their own choice. But the simple fact of the matter is on this record we have 30 years of a family living without issue in El Salvador. Paranoia may be a strong word to use in this situation. Yes, absolutely. They've suffered past incidents that are absolutely unfortunate, and they have just cause to be cautious. Well, you just said the fact that they're paranoid. I'm not sure it's a fact that they're paranoid. They may be afraid, and it may be that other people in a similar circumstance would be more or less afraid. But I think paranoid probably doesn't quite capture it. Perhaps paranoid is an overstatement, but ultimately it's a question of whether or not their fear is objectively reasonable under these circumstances. And under Santos-Limos, this Court has consistently held, in cases prior to that as well, that such a substantial amount of time for a family to remain in the home country without issue substantially undermines an individual's ability to qualify for the relief sought. What we have here is kind of a moving target as well. He's on one hand claiming to fear persecution as a member of his family, but then at the same time trying to distance himself from his family living without issue in El Salvador. He makes a cursory claim that his family members are not similarly situated. That's Administrative Record, page 31, his brief to the Board. So it's hard to know what exactly his argument is on this point. The simple fact of the matter is his family has lived in El Salvador for over three decades without issue. Ultimately, we have also the deferred vengeance theory of the expert witness. Again, the immigration judge here decided to give that little weight, and under substantial evidence standard review, this Court cannot reweigh evidence. That's Jackson v. Shell Oil. That's longstanding precedent. So the Court has to look at what does this record show? While he may subjectively fear going home, it is not objectively reasonable. This Court has no further questions. With regard to the one-year bar, the BIA has a pretty conclusory statement that respondent has failed to establish change circumstances. Is that a sufficiently reasoned explanation, or does the panel need to think about remanding for the BIA to conduct a better analysis? In that situation, what we have is a record that simply doesn't even get to a point where remand would be necessary. It's perhaps sort of saying remand would be futile, but the Board is not required to draft an exegesis when it's writing its opinions. It's able to take the facts that are presented to it and reach a conclusion, which is what is stated here, for it to specifically parse out each piece. Based on these facts simply is unnecessary, especially considering Petitioner's own testimony that he made a conscious decision not to pursue asylum because he didn't think he would get it. So under those circumstances, the Board's decision is adequate. The Court has no further questions. Okay, thank you. Thank you. Ms. Fletcher, would you like a minute to respond? Yes, please. As to the nexus issue, the Board nexus, as opposed to just the protected grounds, was part of the Board's reasoning. And as we argued in our brief, we think that the wrong standard was applied. They applied the REAL-ID Act's one central reason test, which did not amend the withholding statute. Other parts of the REAL-ID Act did explicitly amend that statute, but not as to the nexus requirement. Also, I wanted to mention briefly as to deportees to El Salvador. It's a social group. I'm aware of the Delgado-Ortiz case. And this case is very distinguishable factually because in the Harvard Clinic's gang report in the record, they talk about how there are civil society organizations that serve deportees specifically in El Salvador, and that the Salvadoran government has targeted deportees. It's very different from the situation in Delgado-Ortiz, where it was Mexico, and there wasn't that evidence on the record. It's much more analogous to Enrique Rivas, where the government had set up a set of services for the social group members in that case. And that was one of the bases on which this court relied. Also, oh, am I out of time? Thank you, Judge. My last thing was just to explain that the expert witness explained why his family members are not similarly situated. They're not returnees. He would be a catalyst going back and they're in hiding. Thank you so much. Thank you very much. Many of our mail guard versus holders now submitted for decision.
judges: Tashima, Fletcher, Nguyen